UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ACLU of Indiana – Indiana University | ) | |
| School of Law – Indianapolis Chapter; and | ) | |
| AMANDA PERDUE, on their own behalf | ) | |
| and on behalf of a class of those similarly | ) | |
| situated, | ) | Cause No. 1:09-cv-842-TWP-MJD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE INDIVIDUAL MEMBERS OF THE | ) | |
| INDIANA STATE BOARD OF LAW | ) | |
| EXAMINERS, in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Mental illness is pervasive in our society.  Studies show that up to 26.2% of the adult

population suffers from a diagnosable mental disorder.  Many people thrive despite their

affliction, and their success has eradicated some of the stigma associated with mental illness.

For others, though, mental illness can be personally and professionally crippling.  Moreover,

mental illness disproportionately affects lawyers.[1] Given the extraordinary rigors and

responsibilities of being a lawyer, the majority of states – including Indiana – screen bar

applicants for potential mental health problems.

To that end, Defendants, the individual members of the  Indiana State Board of Law

Examiners ("Defendant" or "Board"), require Indiana bar admission applicants to answer a range

---

[1]Certain mental illnesses occur more frequently among attorneys than the public at large
and major depression, for example, affects attorneys "at nearly four times the rate of the general
population". Report of Martin H. Williams, Ph.D. (Dkt. 158-3 at 3).

of stringent questions about their medical history and fitness to practice law.  In the Court's view, the Board would be derelict in its duty if it did not question bar applicants about their fitness to practice law.  However, the Board's questions are some of the most probing and broadly-worded in the nation.  Through this entry, the Court must answer: Do any of the Board's questions go too far?

On this point, Plaintiffs – Amanda Perdue ("Perdue") and the ACLU Student Chapter of the Indiana University School of Law ("ACLU") (collectively, "Plaintiffs") – contend that four of the bar application questions (i.e. Questions 22 through 25) violate the Americans with Disabilities Act ("ADA").[2]  The Board disagrees, arguing that these questions are lawful and reasonably necessary "to prevent a direct threat to the public." (Dkt. 157 at 2).  This matter is now before the Court on the parties' cross motions for summary judgment.  The parties have thoroughly briefed the issues and oral argument was held on August 24, 2011.  For the reasons set forth, Plaintiffs' Motion (Dkt. 145) is **GRANTED** with respect to Question 23 but **DENIED** with respect to Questions 22, 24, and 25.  Conversely, the Board's Motion (Dkt. 155) is **GRANTED** with respect to Questions 22, 24, and 25 but **DENIED** with respect to Question 23.

### *Legal Standard*

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d

---

[2]In the summary judgment briefing, Plaintiffs offered no meaningful argument that Question 26 violates the ADA.  Therefore, the Court will not address this issue in detail.  Suffice it to say, the Court believes that this question is appropriate under the ADA.

2

487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

Here, the Court is faced with cross-motions for summary judgment.  However, these motions are not subject to a unique standard.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Tippecanoe Associates, LLC v. OfficeMax North America, Inc*., 2009 WL 798745, at *3 (S.D. Ind. March 20, 2009) (citation and internal quotations omitted).

### ***Background***

**A.      Mechanics of the Indiana bar application process[3]**

_____

> [3]The application process is actually far more detailed than what is presented in this entry. However, for the sake of economy, the Court will limit its background section to only the most relevant portions of the process.

As way of background, the Indiana Supreme Court established the Board to certify applicants for admission to the Indiana bar.  Accordingly, the Board must "inquire into and determine the character, fitness and general qualifications to be admitted to practice law as a member of the bar of the Supreme Court of Indiana."  The term "fitness" relates to the "physical and mental suitability of the applicant to practice law in Indiana."  Linda Loepker ("Ms. Loepker"), the Executive Director of the Board and its designee, testified that the operative inquiry is whether the applicant has the <u>current</u> fitness to practice law.  Technically, the Board makes a recommendation to the Indiana Supreme Court as to character and fitness of each applicant, and the Indiana Supreme Court makes a final determination.  As a practical matter, however, the Indiana Supreme Court almost always accepts the Board's recommendation. Tellingly, Ms. Loepker is not aware of any situations where the Board gave its character and fitness stamp of approval, and  the Indiana Supreme Court did not accept their  recommendation.

Through the bar application, the Board explores numerous areas of the bar applicant's life, including his/her mental health.  Questions 22 through 25 are at the heart of this dispute. They read as follows:

> 22.   Have you been diagnosed with or have you been treated for bi-polar disorder, schizophrenia, paranoia, or any other psychotic disorder?

> 23.   From the age of 16 years to the present, have you been diagnosed with or treated for any mental, emotional or nervous disorders?

> 24.   Do you have any condition or impairment (including, but not limited to, substance abuse, alcohol abuse, or a mental, emotional, or nervous disorder or condition) which in any way currently affects, or if untreated could affect, your ability to practice law in a competent and professional manner?

> 25.   IF YOUR ANSWER TO QUESTION 24 IS AFFIRMATIVE, are

4

> the limitations or impairments caused by your mental health condition or substance abuse problem reduced or ameliorated because your receive ongoing treatment (with or without medication) or because you participate in a monitoring program?

Specifically, Question 22 pertains to "serious" diagnosable mental disorders and is not limited in temporal scope. Question 23 is broader in terms of subject matter, relating to "any" mental or emotional disorders, but narrower in terms of temporal scope, only applying to disorders treated from age 16 to present. Questions 24 and 25 relate to how any mental health conditions could potentially impair an applicant's current ability to practice law. These questions are preceded by a preamble stating that the questions are designed "to determine the current fitness of an applicant to practice law."

If the applicant answers "Yes" to any of the above questions, he or she must complete form "B-1," which seeks further information regarding the condition, the diagnosis, the course of treatment, and the treatment provider. Additionally, all applicants must sign a general release of information. If the Board has concerns about the applicant's fitness, the Board can, but does not always,[4] refer the applicant to the Judges and Lawyers Assistance Program ("JLAP"). In determining whether a JLAP referral is appropriate, the Board considers a multitude of factors, including: how recent the mental health issue was; whether it's episodic; whether it required continuing treatment; whether it resulted in hospitalization or arrest; and whether it resulted in loss of employment or licensing. The Board informs the applicant of the JLAP referral through a letter. The letter requests that the applicant contact JLAP and sign a release so that the Board can communicate with JLAP.

---

[4]In fact, statistics suggest that a JLAP referral is the exception, not the rule. This is especially true where the applicant appears to be handling his/her issues appropriately.

5

JLAP, itself, does not counsel or diagnose the applicant, but instead assists the applicant in obtaining a good assessment to address and hopefully assuage the Board's concerns. This may entail referring the applicant to an outside provider for an assessment. Once the assessment is completed, JLAP reports back to the Board concerning the applicant's history, diagnosis, symptoms, treatment recommendations, and prognosis. The Board can accept the applicant, deny the applicant, or offer the applicant a conditional license (which allows admission, providing certain treatment conditions are met).

In the end, very few applicants are denied admission to the Indiana bar due to mental or emotional issues. For instance, of the 649 bar applicants in 2009, 113 answered Questions 22, 23, and/or 24 affirmatively. Of these 113, 17 were referred to JLAP. Out of these 17, four withdrew their applications, and, significantly, none were actually denied admission.

**B.      Law students**

The parties disagree on a handful of factual issues pertaining to law students. One thing that they both agree on, however, is that many law students consult mental health professionals. Some students have serious diagnosable disorders; others are just stressed out – presumably an upshot of attempting to learn such mystifying matters as the "Rule Against Perpetuities" in Property Law class. There is no dispute that the academic rigors of law school can be stressful.

Plaintiffs' expert, Dr. Cooper, is the Director of Counseling Services at Valparaiso and has counseled thousands of law students. By way of affidavit, Dr. Cooper testified that most law students who seek counseling do so to alleviate anxiety, depression, or personal/family concerns. Of these students, Dr. Cooper opines, less than 0.1% (2-3 students over the course of 23 years) presented psychiatric problems of such severity that he doubted their fitness to practice law.

6

Over 23 years, only 0.1% of Dr. Cooper's students were unable to function well enough to graduate.  Further, according to Dr. Cooper, there remains a stigma still attached to mental illness, and  many students worry about having to report counseling on their bar applications, to the point where the mental health-related questions deter students from seeking treatment.

The Board suggests that Dr. Cooper's statistics – particularly those indicating that less than 0.1% of law students are of doubtful fitness to practice law – are out of sync with reality. After all, in any given year, 26.2% of the adult population has a diagnosable mental disorder and 6% suffer from a serious mental illness.  The Board also emphasizes that mental illness is recurring.  For instance, the Board's expert, Dr. Williams, testified that he has evaluated:

> numerous attorneys and other licensed professional, including physicians, who functioned at a very high level between depressive episodes, completed their professional training between episodes, only to experience a recurrence once licensed.  Thus, it is a myth that major mental disorders are consistently disabling, rendering an individual too impaired to be able to graduate college and law school.

The Board also disputes the notion that many students are reticent to seek counseling because they will have to disclose it on their bar applications.  According to Ms. Loepker, students view counseling as "not a big deal . . . [i]f I'm stressed at law school, of course, I'm going to go get help."

## C.     Plaintiffs

As mentioned above, there are two Plaintiffs in this action: (1) Amanda Perdue and (2) the ACLU.  Perdue graduated from Valparaiso law school in May 2007, was admitted to the Illinois Bar, and worked for a prestigious law firm in Chicago.  In January 2008, Perdue made a troubling statement to her friend, which prompted her friend to call the police out of fear for

Perdue's safety.  Certain events transpired, and, in August 2008, Perdue sued Porter-Starke Hospital ("Porter-Starke"), using a pseudonym.  Ultimately, the court dismissed Perdue's claim due to her refusal to use her real name in the lawsuit.

In December 2008, Perdue filled out an application to the Indiana bar.  In response to Question 15 (an unchallenged question relating to prior litigation), Perdue disclosed the lawsuit against Porter-Starke.  Perdue also answered Question 23 affirmatively and filled out the corresponding B-1 form.  Upon receiving Perdue's application, the Board determined that she should contact JLAP.  Perdue, however, refused to sign a release to permit JLAP to receive her medical records and refused to meet with JLAP.  Soon thereafter, Perdue withdrew her bar application.  As it stands, Perdue would like to apply for the Indiana bar again, but objects to Questions 22 through 25 and being referred to JLAP.  Perdue maintains that the only relevant consideration is her _current_ fitness to practice law, not her previous diagnoses.  In her view, these questions are both unreasonable and unlawful.

Similarly, the ACLU has numerous members who will, at the very least, have to answer Question 23 affirmatively.  Those members have remained anonymous throughout the duration of this lawsuit.  Like Perdue, the ACLU objects to these questions because they allegedly don't have any bearing on _current_ fitness to practice law.

### _Discussion_

In this dispute, the Board makes two basic arguments in favor of summary judgment: (1) Plaintiffs lack standing to challenge Questions 22 through 25; and (2) standing issues aside, the questions are nonetheless permissible under the ADA.  Plaintiffs counter that, first, they have standing to challenge the questions, and, second, the questions are impermissible under the

ADA.          Normally, the Court would be inclined to address the threshold standing issue in detail before turning to the ADA-related legal issues.  Under these unique circumstances, however, the Court has resolved that the simpler approach is to first analyze the lawfulness of Questions 22 through 25 under the ADA.  In doing so, the Court finds that Question 23 violates the ADA, while Questions 22, 24, and 25 are permissible.  In light of this ruling, the Court only needs to address whether any of the Plaintiffs have standing to challenge Question 23.  The Court finds that, at the very least, the ACLU has standing to challenge this question.  The Court's analysis follows.

**A.     Do Questions 22 through 25 violate the ADA?**

     *1.     Title II of the ADA*

Congress enacted the ADA to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101.  This case falls under Title II of the ADA, which relates to disability discrimination by public entities. Specifically, Title II provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  A public entity includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).  Courts have uniformly agreed that entities that license and regulate attorneys are public entities for purposes of the ADA. *See, e.g., Ware v. Wyoming Bd. of Law Examiners*, 973 F. Supp. 1339, 1352 (D. Wyo. 1997); *Ellen S. v. Florida Bd. of Bar Examiners*, 859 F. Supp. 1489, 1493 n. 4 (S.D. Fla.1994).  And, here, the parties do not dispute that the Board is a public

entity subject to Title II of the ADA.

Because Title II applies to "qualified individuals with a disability," the Court must first determine if Plaintiffs are "disabled" for purposes of the ADA.  Under the ADA, "disability" is defined as: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1) (emphasis added).  A person is "'regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3).  Plaintiffs argue that because they must answer certain challenged questions affirmatively, they are "disabled" under the ADA, as the Board imposes additional requirements on them due to their mental health history.  In other words, Plaintiffs are "disabled" due to "an actual or perceived . . . mental impairment." *Id*.  The Court agrees with this reasoning, and, notably, the Board does not meaningfully dispute it.

Under Title II of the ADA, the prohibition against discrimination extends to "qualified individual[s] with a disability." 42 U.S.C. § 12131(2).  The ADA defines the term to include:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id* (emphasis added).  Plaintiffs allege that, in this context, the "essential eligibility requirements" refer to bar admission eligibility.  Plaintiffs are individuals who wish to take the

bar exam without responding to the mandatory questions pertaining to mental health.  Removal of the questions will allow them to participate in the bar application process without answering these questions.  In this sense, the Court agrees that Plaintiffs are "qualified individuals with a disability."  While the Board may dispute this position, it has failed to present sufficient authority or argument to support its position.[5]

Significantly, the implementing regulations of the ADA prohibit a public entity, such as the Board, from administering "a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(6) (emphasis added).  Similarly, a public entity is prohibited from imposing or applying "eligibility criteria that screen out an individual with a disability . . . from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8) (emphasis added).  "This tend-to-screen out concept . . . makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish any individual's chances of such participation." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 134-35 (D. Mass. 1997) (citation and internal quotations omitted).

Importantly, here, questions of public safety are potentially involved.  Accordingly, the determination of whether an applicant meets "essential eligibility requirements" involves consideration of whether the individual with a disability poses a "direct threat to his own health and safety or that of others." *Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009)

---

[5]At oral arguments, counsel for the Board maintained that Plaintiffs are *not* qualified individuals with disabilities.  However, this point was not fleshed out in the Board's briefing.

(citation and internal quotations omitted.  Specifically, the regulations provide that a public entity is:

> not required to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of the public accommodation, <u>if that individual poses a direct threat to the health or safety of others</u>.

28 C.F.R. Pt. 35, App. B (emphasis added).  The determination that a person poses such a threat may not be based on generalizations or stereotypes about the effects of a particular disability.  *Id.* Instead, it must be based on:

> an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

*Id.*  According to the Board, the challenged questions are "reasonably necessary to determine whether an applicant possesses the current fitness to practice law." (Dkt. 157 at 22).

Notably, courts throughout the country have, with virtual unanimity, ruled that the ADA applies to questions posed to applicants by legal licensing boards.  In other words, the Board does not have carte blanche to pry into every crevice of the bar applicant's life, as the ADA prohibits at least *some* disability-related inquiries. *See, e.g., Clark v.  Va. Bd. of Law Examiners*, 880 F. Supp. 430, 446 (E.D. Va. 1995) ("Question 20(b)'s broadly worded mental health question discriminates against disabled applicants by imposing additional eligibility criteria"); *Ellen S.,* 859 F. Supp. at 1493-94 (Florida's mental health questions "discriminate against Plaintiffs by subjecting them to additional burdens based on their disability."); *In re Underwood*, 1993 WL 649283, at *1-2 (Me. Dec. 7, 1993) (requirement that applicants answer mental health questions discriminates on the

12

basis of disability and imposes eligibility criteria that unnecessarily screen out individuals with

disabilities); *In re Petition and Questionnaire for Admission to the Rhode Island Bar*, 683 A.2d

1333, 1336 (R.I. 1996) ("the ADA applies to State Bar admissions"); *Medical Society of New*

*Jersey v. Jacobs*, 1993 WL 413016, at *7 (D.N.J. Oct. 5, 1993) (case involving state agency that

licenses physicians; "these regulations prohibit the imposition of extra burdens on qualified

individuals with disabilities when those burdens are unnecessary . . . [y]et this is exactly what the

Board is doing."); *Doe v. Nominating Commission for the Fifteenth Judicial Circuit of Florida*,

906 F. Supp. 1534, 1544-45 (S.D. Fla. 1995) (ruling that certain questions posed to judicial

applicants were overbroad and thus violated the ADA).

### 2.   *Challenged Questions*

Certainly, the Board's permissible zone of inquiry into applicants' lives is not limitless;

however, both the applicable law and common sense suggest that the Board is entitled to some

leeway.  After all, clients entrust their attorneys with their money, their property, their familial

status, and, often, their freedom.  Obviously, an attorney in the throes of a debilitating bout of

mental illness could wreak havoc on his clients' lives.  In this sense, certain attorneys with mental

illnesses could pose a "direct threat" to their clients – that is, "a significant risk to the health or

safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or

by the provision of auxiliary aids or services." 28 C.F.R. Pt. 35, App. B.  For this reason, the

Board is well within its rights to make certain inquiries into bar applicants' character and fitness.

Nonetheless, the Board's questions must stay within the confines of the ADA.

To summarize, the ADA prohibits the use of licensing procedures that "screen out or tend

to screen out" individuals defined as disabled under the ADA, unless the screening criteria are

"necessary" to the service being offered.  Essentially, the Court must resolve whether the challenged questions are "necessary" to determine whether the bar applicant poses a "direct threat."  The Board argues that all of the challenged questions are necessary.  Plaintiffs, of course, vehemently disagree, claiming that the challenged questions violate the ADA because they are too invasive, too broad, and too unfocused.  To make its determination, the Court will analyze the challenged questions in turn.

### i.   Question 22

To reiterate, Question 22 asks the applicant: **"Have you ever been diagnosed with or have you been treated for bi-polar disorder, schizophrenia, paranoia, or any other psychotic disorder?"**  Significantly, this question is similar to questions that have been upheld by district courts in Texas and Virginia. *See Applicants v. Texas State Bd. of Law Examiners,* 1994 WL 923404 (W.D. Tex. Oct. 11, 1994) (upholding limited inquiry into whether applicant has been diagnosed with or treated for "bipolar disorder, schizophrenia, paranoia, or any other psychotic disorder" within the last 10 years); *O'Brien v. Virginia Bd. of Bar Examiners*, 1998 WL 391019 (E.D. Va. Jan. 23, 1998) (denying preliminary injunction seeking to enjoin the following question: "Within the past five years, have you been diagnosed with or have you been treated for any of the following: schizophrenia or any other psychotic disorder, delusional disorder, bipolar or manic depressive mood disorder, major depression, antisocial personality disorder, or any other condition which significantly impaired your behavior, judgment, understanding, capacity to recognize reality, or ability to function in school, work or other important life activities?").

The Court generally agrees with these decisions.  As the Western District of Texas reasoned in *Applicants*:

14

> Bipolar disorder, schizophrenia, paranoia, and psychotic disorders are serious mental illnesses that may affect a person's ability to practice law. People suffering from these illnesses may suffer debilitating symptoms that inhibit their ability to function normally. <u>The fact that a person may have experienced an episode of one of these mental illnesses in the past but is not currently experiencing symptoms does not mean that the person will not experience another episode in the future or that the person is currently fit to practice law</u>. Indeed, a person suffering from one of these illnesses may have extended periods between episodes, possibly as much as ten years for bipolar disorder or schizophrenia. Although a past diagnosis of the mental illness will not necessarily predict the applicant's future behavior, the mental health history is important to provide the Board with information regarding the applicant's insight into his or her illness and degree of cooperation in controlling it through counseling and medication. <u>In summary, inquiry into past diagnosis and treatment of the severe mental illnesses is necessary to provide the Board with the best information available with which to assess the functional capacity of the individual</u>.

*Id*. at \*3 (emphasis added).

Plaintiffs counter that, unlike the questions in *Applicants* and *O'Brien*, Question 22 is unlimited in terms of temporal scope.  However, the Board had a sound basis for its decision to craft a temporally broad question, given the undisputed evidence that mental illnesses tend to recur throughout a person's lifetime.  Since Question 22 involves "serious" mental illnesses that could recur, the Court finds that the unlimited temporal scope of Question 22 does not run afoul of the ADA.

### ii.      Question 23

Question 23 is quite possibly the most expansive bar application question in the country.  It asks the applicant: **"From the age of 16 years to the present, have you been diagnosed with or treated for any mental, emotional or nervous disorders?"**  No court has ever upheld a question of this breadth. *See, e.g., Clark*, 880 F. Supp. at 446 (deeming the following question improper under the ADA: "Have you within the past five (5) years, been treated or counseled for a mental,

emotional or nervous disorder[]?"); *Ellen S.,* 859 F. Supp. at 1494 (ruling that plaintiffs stated a

claim under the ADA related to the following question: "Have you ever consulted a psychiatrist,

psychologist, mental health counselor or medical practitioner for any mental, nervous or emotional

condition, drug or alcohol use?").  The Court generally agrees with the reasoning employed in

these cases, particularly *Clark*.

Question 23 captures a broad swath of information related to less serious mental and

emotional problems.  Further, the question itself is so open-ended that it could easily put a bar

applicant in a confusing bind.  For instance, if a first-year law student was feeling some natural

anxiety about his upcoming Property Law final exam and sought out counseling to enhance his

ability to relax, would he have to answer Question 23 affirmatively?  The Court isn't sure.  More

to the point, why would such a student present concerns for the Board?

Simply stated, Question 23 is too broad, and the available statistics appear to reinforce this

point.  In 2009, 94 applicants answered Question 23 affirmatively, but, *in total*, only 17 applicants

were even referred to JLAP.  Clearly, Question 23 is yielding a considerable number of false

positives (i.e. flagging applicants that are unproblematic). Moreover, it is worth noting that the

time frame used in Question 23 – from the age of 16 forward – is arbitrary, given that bar

applicants' ages vary greatly.  For instance, if the applicant is 50 years old, it stands to reason that

his mental health status at the age of 16 is not a very good indicator of his *current* mental fitness to

practice law.  Finally, assuming the bar applicant answers the questions honestly, it is altogether

unclear what *useful* information is extracted from this question that isn't extracted from Questions

22, 24, or 25.  For these reasons, the Court believes that Question 23, in its current form, is overly

broad, not reasonably contemplated to capture "direct threats," and, thus, improper under the

ADA.[6]

### iii.   Questions 24 and 25

To reiterate, Questions 24 and 25 pose the following inquiries:

> **(24)   Do you have any condition or impairment (including, but not limited to, substance abuse, alcohol abuse, or a mental, emotional, or nervous disorder or condition) which in any way currently affects, or if untreated could affect, your ability to practice law in a competent and professional manner?**

> **(25)   IF YOUR ANSWER TO QUESTION 24 IS AFFIRMATIVE, are the limitations or impairments caused by your mental health condition or substance abuse problem reduced or ameliorated because your receive ongoing treatment (with or without medication) or because you participate in a monitoring program?**

Undoubtedly, these related questions are narrowly focused on the *current* time period.  So, at first blush, it is unclear why Plaintiffs included these queries in this lawsuit.  Throughout this litigation, Plaintiffs have insisted that the bar applications should single-mindedly focus on the applicants' *current* ability to practice law, and these questions do just that.

Nonetheless, Plaintiffs argue that these questions are still too broad.  For instance, an applicant who is being treated for a mental disorder and functioning well would have to answer Question 24 affirmatively.  But, because that applicant is in a stable condition, he would not pose a significant risk.  Therefore, Questions 24 and 25 necessarily captures applicants who are not actual "direct threats," meaning these questions are outside the parameters of the ADA.  Moreover, Plaintiffs argue that these questions are not particularly useful, as, in 2009, only 11 of the 649

---

[6]Perhaps a narrower version of Question 23 would comply with the ADA.  Regardless, the Court's decision is to determine the lawfulness of Question 23 – not to reformulate an inquiry that would comply with the ADA. *See Clark*, 880 F. Supp. at 446

applicants answered "Yes" to Question 24 (thus triggering the need to answer Question 25).

The Court respectfully disagrees.  As an initial matter, Plaintiffs' argument that these questions lack efficacy because few people answer them affirmatively is unpersuasive.  The Court cannot rule that a bar application question fails to comply with the ADA – and thus warrants enjoinment – simply because a low percentage of applicants answer "Yes."  Moreover, the Board's evidence shows that even if the applicant is seeking treatment, "all available treatments have their limitations and there are few [mental] disorders where it is possible to be cured." (Dkt. 158-1 at 2).  Finally, if the Court adopted Plaintiffs' position, then the Board would be required to jettison the portion of the inquiry related to treatment.  However, this is an important part of the question.  Without it, the question is reduced to a mere subjective inquiry into the applicant's belief about his or her own current ability to practice law.  But this isn't much of an inquiry.  Obviously, the vast majority of, if not all, bar applicants believe they are fit to practice law.  In sum, because Questions 24 and 25 appropriately bear on the applicant's *current* ability to practice law, they are permissible under the ADA.

### 3. *Facial Challenge*

All along, Plaintiffs have presented this lawsuit as a *facial* challenge to Questions 22 through 25.  In a final attempt to defeat Plaintiffs' case, the Board argues that the facial nature of the claims presents insurmountable obstacles.  In essence, a facial challenge is a claim that a statute or regulation is *always* unlawful. *Babbitt v. Sweet Home Chapter, Communities for a Great Ore.*, 515 U.S. 687, 699-700 (1995).  This type of challenge is "the most difficult . . . to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

18

Using these principles, the Board argues that Plaintiffs' claims cannot survive a facial challenge because these questions "were proper as to . . . Perdue and other specific applicants" who have encountered problems practicing law, some of which presumably stem from mental health issues. (Dkt. 179 at 8). The Court respectfully disagrees for two reason. First, in the Court's view, the Board's argument ignores context. Specifically, the challenged questions are merely the first step in a potentially protracted and individualized process used to assess the fitness of the applicant. In other words, certain questions – like Question 23 – might be appropriate to ask after other, less invasive questions have triggered the need for a more searching review of the candidate, but such questions would be inappropriate to ask the applicant right off the bat. Second, the Board's argument appears to be premised on a faulty assumption: That is, a question is automatically appropriate if it sometimes unearths useful information. If this were the standard, the Board could ask applicants' almost any question, no matter how invasive. For instance, the question "Have you ever gone to the hospital, and, if so, why?" undoubtedly has the potential to unearth useful information. However, as the Board would presumably concede, such an all-encompassing question would violate the ADA. Thus, notwithstanding the facial nature of Plaintiffs' challenge, the Court still finds that Question 23 is inappropriate to ask as an initial inquiry to all bar applicants.

**B.      Do Plaintiffs Have Standing?**

The Board also argues that it is entitled to summary judgment because Plaintiffs lack standing. Given the Court's above ruling, it only need to address whether any of the Plaintiffs have standing to challenge Question 23. To make this determination, a review of general standing principles is instructive. Standing determines "the power of the court to entertain the

suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Specifically, Article III of the United States

Constitution limits the federal courts' subject matter jurisdiction to "actual cases or

controversies," *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation and internal quotations

omitted), and it is well-settled that "standing is an essential component of Article III's

case-or-controversy requirement." *Apex Digital, Inc. v. Sears Roebuck & Co*, 572 F.3d 440, 443

(7th Cir. 2009) (citation omitted).  To demonstrate standing, the plaintiff bears the burden of

proving three elements:

> First, the plaintiff must have suffered an 'injury in fact'– an invasion
> of a legally protected interest which is (a) concrete and particularized
> and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'
>
> Second, there must be a causal connection between the injury and the
> conduct complained of – the injury has to be 'fairly traceable to the
> challenged action of the defendant, and not the result of the
> independent action of some third party not before the court.'
>
> Third, it must be 'likely,' as opposed to merely 'speculative,' that the
> injury will be 'redressed by a favorable decision.'

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations and internal citations

omitted).

Here, the Court finds that, at the very least, the ACLU has standing to challenge Question

23.  An organization such as the ACLU has standing to bring suit on behalf of its members

when: (1) "its members would otherwise have standing to sue in their own right;" (2) the

interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim

asserted nor the relief requested requires the participation in the lawsuit of each of the individual

members." *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977).  Here,

only the first element – whether its members have standing individually – is disputed.  On this

point, to have associational standing, only one member of the organizations needs to be injured or threatened with injury. *Disability Rights Wisconsin, Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (citation omitted).

By way of their reply brief, the ACLU attached three supplemental affidavits stating as follows:

> I have reviewed the other questions on the application for the Indiana bar and I do not believe that when the time comes for me to complete and submit the application that I will answer the questions, with the exception of question 23, in a manner that would mention my history of receiving treatment for mental, emotional, or nervous disorders or that would raise concerns that would lead to inquiries about, or discovery of, my history of receiving treatment for mental, emotional, or nervous disorders.

(*See, e.g.,* Dkt. 171-1 at 3).  In the Court's view, these affidavits are adequate to establish standing to challenge Question 23.

To clarify this determination, it is worth discussing Perdue's standing problems.  The Board argues that Perdue lacks standing because even if all of the challenged questions were jettisoned from the bar application, Perdue would've answered Question 15 (an unchallenged question concerning prior litigation) affirmatively.  In turn, this answer would've revealed information about her mental health condition and thus triggered additional Board scrutiny.  So, as a practical matter, even if Perdue is victorious in this lawsuit, she would still have to reveal the same underlying information and endure the same burdensome process. *See United States v. Jester*, 139 F.3d 1168 (7th Cir. 1998) (plaintiff lacked standing because, even if his constitutional arguments were valid, he would not personally benefit from prevailing).  In other words, if Perdue were to prevail in this lawsuit, it is unclear what she would actually gain (other than perhaps the subjective "psychic benefit" that accompanies victory). *See Diaz v. Duckworth*,

143 F.3d 345, 347 (7th Cir.1998) ("A basic principle of standing is that a person is not entitled to litigate in a federal court unless he can show a reasonable probability of obtaining a tangible benefit from winning . . .") (emphasis added).[7]

The ACLU affiants avoided this standing roadblock by attaching supplementary affidavits specifying that certain individual members will not have to disclose any information concerning their mental health histories in responding to the bar application, *other than through Question 23*. The Board counters that the Court should disregard these affidavits because it has not been given the chance to depose these anonymous ACLU members to verify the accuracy of their sworn affidavits.  The Court, however, is not persuaded.  Law students – future bar applicants – certainly have the reading comprehension skills to review bar application questions and accurately testify how they will answer them.  Thus, for these reasons, the Court finds that the ACLU has standing to challenge Question 23.

### *Conclusion*

Perhaps no set of bar application questions could strike the perfect balance between detecting problematic bar applicants and respecting applicants' privacy.  To borrow statistical lexicon, there will always be some Type I errors (false positives, i.e. flagging unproblematic

---

[7]It is also worth noting that, from what the Court gathered, there is no evidence to suggest that any Plaintiff in this case would answer Question 22 affirmatively.  For this reason, no Plaintiff has standing to contest this question.  After all, Plaintiffs repeatedly emphasize that "[h]aving to answer the questions affirmatively is the injury that binds the class." (Dkt. 171 at 15) (emphasis added).  In the end, though, this point is academic, given the Court's above ruling.

applicants) and some Type II errors (false negatives, i.e. failing to flag a problematic applicant). While the Board has no doubt endeavored to strike the right balance, in the Court's view, Question 23 simply goes too far and strays outside of the parameters of the ADA. For this reason, Plaintiffs' Motion (Dkt. 145) is **GRANTED** with respect to Question 23 but **DENIED** with respect to Questions 22, 24, and 25. Conversely, the Board's Motion (Dkt. 155) is **GRANTED** with respect to Questions 22, 24, and 25 but **DENIED** with respect to Question 23.

The parties are directed to notify the Court within seven days if entry of Final Judgment is appropriate. If the parties agree that Final Judgment is appropriate, they are directed to submit a mutually agreeable proposed Final Judgment at that time.

SO ORDERED:   09/20/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Darren Andrew Craig**
FROST BROWN TODD LLC
dcraig@fbtlaw.com,jwhitaker@fbtlaw.com

**Kenneth J. Falk**
ACLU OF INDIANA
kfalk@aclu-in.org,kkendall@aclu-in.org,jmensz@aclu-in.org

**Anthony W. Overholt**
FROST BROWN TODD LLC
aoverholt@fbtlaw.com,kdickerson@fbtlaw.com